B020H. Texas Brine goes first, it looks like. Good morning, Your Honor. Chris Chaklis for Texas Brine. And I wanted to start the argument. This is based on the briefs. This is not a simple cut-and-dried case, not a simple cut-and-dried appeal. There is an interplay between coverage issues, class action issues, and kind of the inherent factual complexity of the underlying dispute. That said, we do think that the district court judge in this case, Judge Zaney, got it right in a way in his lower court opinion that we are appealing when he said that, and just to restate what we're seeking here, Texas Brine is asking this court to overturn the district court Judge Zaney's approval of a settlement between the plaintiffs and some of Texas Brine's insurers. It was a settlement that did not fully release Texas Brine from the case, so some of Texas Brine's insurers settled with plaintiffs and got out of the case. Texas Brine is still in the case. And what Judge Zaney found in his opinion that overruled our exceptions is that this really comes down to a coverage dispute. He wrote that the coverage dispute is essentially the crux of Texas Brine's objections to the settlement, and we agree with that. We just disagree with Judge Zaney's conclusions. And so I want to get to the coverage part, but first I think it is necessary to address what some of the appellees have raised, which was challenging Texas Brine's standing to challenge this settlement. And we have cited a Fifth Circuit case in Vioxx, which is consistent with all the decisions of circuit courts that say that essentially Texas Brine was not a party to this settlement. The settlement was confected by some of its insurers and the plaintiffs that left cut out some claims, these unreleased claims that Texas Brine still must defend in this litigation. And the basic rule is that non-settling parties have the right to challenge settlements if they suffer legal prejudice. And that's kind of a broad concept that encompasses stripping rights of contribution or indemnity, or critically interfering with a party's contractual right or ability to seek contribution or indemnity. And here, again, we are challenging Judge Zaney's decision that approved the settlement, but he did make some points in his ruling, overruling our objections, that we do agree with. And particularly on this question of prejudice. And just to go back into it, to get into the details of the settlement a little bit, what happened is there was claims in this case, this claims arises out of the Bayou Corn sinkhole, which is an event that happened in August, that a sinkhole emerged, it became noticed in August of 2012. There were several different lawsuits that had been filed in state and federal court, some of which have been before this court already in different contexts, at least a couple times that I'm aware of. And in this particular case that's pending in federal court, there was allegations by the landowners around the sinkhole that they suffered various forms of damage. And there was, the parties have tried to distinguish it between damages that they call precinct hole damages. And basically, so the claims for precinct hole damages have been released against the appellees in this case, AIG and Zurich, but these with quote unquote sinkhole related damages are, claims for sinkhole related damages are unreleased against Texas Brine and Texas Brine still must defend those claims for sinkhole related damages in the federal case. And the settlement, Texas Brine's main objection to the settlement is that we believe that one of our pre-2012 insurers, particularly Zurich, and we presented evidence at the fairness hearing that they owe coverage for quote unquote sinkhole related damages because the sinkhole process started before, or the sinkhole process started during, should be deemed to have started during a Zurich policy period. The Zurich policy started, I think it was March 1st, 2011 through March 1st, 2012. And we believe that the evidence we presented at the, at the fairness hearing showed that Zurich owes coverage for quote unquote sinkhole related damages and thus should be obliged to contribute to any settlement or any indemnity of these unreleased claims of sinkhole related damage. But the settlement agreement itself between plaintiffs, Zurich, and AIG inhibits Texas Brine's attempt to get any contribution or indemnity from Zurich to settle the remaining claims in this lawsuit. So in other, essentially the settlement says that if Texas Brine wants to settle the claims with plaintiffs for claims for sinkhole related damages, any settlement with the plaintiffs must, as a condition, force Texas Brine to release Zurich and its other pre-2012 insurer, AIG, as part of any settlement. So essentially, if we want to go ahead and settle with the plaintiffs for the remaining claims of sinkhole related damages, we are unable to do so without releasing Zurich and AIG. And what Judge Zaney found was that this settlement, and I'm just quoting from his, his opinion, this settlement would constrain indirectly any effort by Texas Brine to pursue the AIG insurance companies and Zurich for indemnification should Texas Brine ultimately choose to compromise the unreleased claims. Texas Brine's contention that this will impede any future settlement with the Sanchez class for the unreleased claims is indisputable. So that was Judge Zaney's October 8th, 2019 opinion at record site 38744, page five of his opinion. He basically found it was indisputable that, that this settlement interferes with our ability to get Zurich to contribute to any future settlement with plaintiffs if we want to settle with them. And then in that way, Texas Brine has been prejudiced and we think does have standing to this appeal. So unless your honors have any questions on the standing, we'll get to the merits of the appeal. And in doing so, we want to say that there, as has been, as we've set forth in the briefs, there are basically three types of claims, three types of damages that were alleged in this dispute. There was quote, unquote- on the question of legal prejudice and your argument that these damages for that you're going to face after this settlement really began before the sinkhole literally occurred, that they began with some period of deformation, etc., etc. Other than the precedent you relied upon, such as asbestos and other things, what evidence did you present at the fairness hearing or otherwise to show that your actual, that would prove that the damage, the deformation began before the sinkhole occurred and that you would benefit from that in not being, that you would your insurers for this second phase? Your honor, I will answer that question just real quick because I didn't do this at the beginning. Can I reserve five minutes of rebuttal time? You have five minutes reserved. Okay, thank you. The evidence that we presented at the fairness hearing was basically twofold, was the various, there were experts that were expert declaration and we cited to expert reports that said that the deformation process, and let me, I have to back up a bit. Again, this gets kind of factually complex, but the way the sinkhole happened, and we cited a 27604, which was the state court, there was a liability trial in state court, which got into the total nitty-gritty of exactly what happened to cause the sinkhole to form. And what happened was there was a, basically there's this salt cavern, that's this enormous jug, essentially a jug the size of the Empire State Building. We know that, we know that, we just want to know the proof. You're evidence, I'm just asking you what your evidence is. The evidence is the declaration of William Barnhart, our expert, plus the expert reports of the AIG expert, Glenn Hickerson, that said that the deformation process started at a period of time between June 23rd, 2011 through July 2nd, 2012. And it started, AIG and Zurich have said in their briefs that the earliest date that we could show that the process started was July 2nd, 2012, and that's just false. That's not what the evidence said that we presented by the experts. Counsel, the sinkhole became apparent in August of 2012, is that right? Yes, that's when it emerged. And as I understand it, in Louisiana, you have, as regards property damage claims, you have this manifestation theory with regard to property damage claims. And so, your claim arises at the time the damage is manifested. Is that the essence of that theory? That is the essence of that theory, but we disagree that that theory... So, that would be outside the policy here. I agree that if the trigger of coverage is when the sinkhole became noticeable, then at that point, then we have a much difficult argument to say... So, are you saying the manifestation theory should not have been applied? Are you saying it was wrongly applied? Tell me what your argument is in connection with that. Well, Your Honor, I guess I would put it this way. I'm not entirely sure if Judge Zaney applied the manifestation theory in his ruling, but I think he may have implicitly applied it. I'm not entirely sure, looking at his opinion, if there was something where he directly said that, but that is certainly the argument that AIG and Zurich have made, both to Judge Zaney and in the appellate brief. And I think we just... In our reply brief, we cited to a Louisiana Fourth Circuit Court of Appeal case that said the manifestation theory does not apply as a matter of law to all coverage disputes. It just doesn't. You have to look at the policy language, most of all. And in this instance, the policy language from Zurich, the reason why we think that the trigger is not when the sinkhole became noticeable is that if you look at the definition of property damage in the policy, and this is at 37044, it does not say that property damage, that does not define property damage as property damage that it says occurs during the policy period. And then it goes on to say that the definition of property damage includes damage which occurs during the policy period and was not, prior to the policy period, known to have occurred to the insured and includes any continuation change or resumption of that bodily injury or property damage after the end of the policy period. So we think that, as put forth in that, I think the case is Shoid. You can get the site, but it's a Fourth Circuit case, that's 673 Southern 2nd, 274, that said manifestation does not apply as a matter of law. You look at the policy language, and if our pre-2012 insurers, AIG and Zurich, wanted to put in the policy that coverage is triggered upon notice or awareness of the damage, and that's what they could have put in their policy, but they didn't. And in fact, their policy implicitly allows for coverage that is not known to have occurred during the policy, and that continues going forward. So we think that the question really comes down to, was the subsidence, the deformation that occurred as a result of the breach in the cavern, did that subsidence occur during the Zurich policy period? And on that question, we presented expert evidence from both our expert and critically the AIG expert who said that this subsidence deformation, they said it occurred June 23rd, 2011 and before July 2nd, 2012. So it occurred during that policy period. Now I'll go ahead and address what obviously the other, what we're probably going to hear from the other side. July 2nd, 2012 would be after the policy period. That's correct. July 2nd, 2012 would be after the policy period. And so there is again, there is this June 23rd, 2011 to July 2nd, 2012 time period. It happened at some point during that period of time is when the expert testimony says that this deformation occurred. And- So you're agreeing that according to the experts, it could have been outside the policy period. That's what the expert- No one can say for sure. Apparently you're an expert. Correct. That's correct. Based on the expert testimony in the record, that is, you're absolutely correct. And what we would argue- You're arguing in that apportionment. Correct. That's correct. And I want to say that, and this gets into what, you know, the Norfolk Southern case and the asbestos context where they find what triggers. And I think that as it's been characterized by AIG and Zurich, they talk about exposure and manifestation. And that's not really what this is about because we're not saying that there was in the asbestos context, you know, that there was some exposure that happened 20 years ago and there's manifestation 20 years later. And how do you connect that? What we're really talking about is a defined period of time. That's not separated by decades, but just, you know, the June, 2011 to July, 2012 period that the expert testimony says, we can't figure it out where it is in between here. But if you look at those asbestos and what they're saying is we don't know when the exposure, when, if somebody alleges that there was exposure, we don't know if the exposure that allegedly occurred when, for instance, their period of employment or in the Norfolk Southern case during the operations of, I think it was a wood clearing project or what, you know, it was the use of creosote. They're not saying that there was proof of damage during each particular policy period. All they're doing is, is approximating, you know, trying to use a mode of analysis to say that the opera, you know, in the Norfolk Southern case that the operation- Counselor, I think you've gone on answering the question enough. Your time's up. Okay. May I just ask- Mark still has something further for you. Listen up. Sure. Right. I just want a quick answer because I want the appellees to reply to this and then you can get to it again in your rebuttal. But I noted that in your reply brief, you don't even address the appellee's argument about why the settlement was not premature. You argue your second point in this case, or that the settlement was premature, but you don't have anything about that in your reply brief. I know you're not conceding their position, but why didn't you have something about that in your reply brief? We were looking at that. I think it was more in a way of an alternative argument in saying that, you know, that we think that this coverage issue is critical and it has to be resolved before the court can approve the settlement because it has to be determined whether or not there is coverage before they can basically release Zurich. So it all comes down to coverage, essentially. All right, Counsel. You do have some time for rebuttal. Thank you. Looks like Mr. Centola goes next. Thank you, Your Honors. I represent the plaintiffs along with the Plaintiff's Steering Committee. And in this case, from the damage standpoint, we do have two separate analysis and damage issues. One is the pre-2012 subsidence damage. Those are the ones that have been settled. And then you had a big hole open up in the ground that happened in August 2012. Those are the damages that have not been settled. And what Texas Brine is trying to do is use the coverage for the pre-sinkhole damages and try and use that coverage to pay for the post-sinkhole damages. And that doesn't create legal prejudice. Our settlement with the pre-2012 insurers does not create legal prejudice because what Texas Brine is trying to do is something that they're not able to do by law. Just because they want to do it doesn't mean that they're able to do it. And just because they're not able to do what they want to do doesn't create legal prejudice. Counsel, would you stop? Please stop. I was afraid we lost Judge Graves. No, I'm here. Okay. I was afraid you got disconnected and we're not able to hear what was going on. No, I just turned off my video for a second. Sounds good. Mr. Centola, sorry to interrupt. No problem. Thank you, Your Honors. But because there's no legal prejudice, because Texas Brine can't legally do what they're trying to do, there is no standing on Texas Brine's part to object to this settlement. We want, and Texas Brine still has insurance for the 2012, it still has coverage for these post-2012 damages. We want to settle with those insurers. We're have not been able to settle with it. But it's not as if Texas Brine is left bare with no coverage when the plaintiffs settled for the pre-2012 damages with the pre-2012 insurers and reserved the 2012 and further damages to take up with Texas Brine and their post-2012 insurers. Because no legal prejudice, Texas Brine has no standing, and I'll cede the rest of my time to the insurance lawyers. Well, they don't get your time, the court does. All right, Ms. Johnson, on my list, you're next. Thank you, Your Honor. Mary Johnson, I represent National Union and AIG Specialty, the AIG insurers. The class settlement at issue fully releases Texas Brine from liability for all class members' claims arising from the Bayou Corn sinkhole and dismisses with prejudice all pre-2012 claims against non-settling defendant, Texas Brine, who is the sole party who objected to the settlement. Texas Brine asked the court to reverse and vacate the judgment approving the class settlement, arguing that CGL policies that expired before the sinkhole should provide coverage for the class members' post-sinkhole claims. With respect to the standing issue, Texas Brine concedes it doesn't have standing to object to the AIG insurer's settlement because it can't establish plain legal prejudice. The National Union's last policy expired on March 1, 2009, three years before the sinkhole. All of Texas Brine's arguments have been focused on the to address that. It's clear that Texas Brine abandoned any argument for coverage under the pre-2009 policies issued by the AIG insurers, and we cited Snell v. Connick and Crows v. Humana, Fifth Circuit precedent, that it wasn't briefed, it wasn't argued, and it's abandoned. The district court here properly exercised its discretion in denying Texas Brine's objection to the class settlement, and correctly applied Louisiana law in rejecting Texas Brine's coverage related arguments. Without ruling on whether Texas Brine has standing to object to the class settlement, Judge Zaney did consider the merits of Texas Brine's objections. What's important for the court to see is that each of Texas Brine's codependent arguments presuppose the correctness of its other arguments. For example, Texas Brine's standing to challenge the settlement rests on its alleged right to seek contribution from Zurich under its 2011 policy. That right to seek contribution is dependent on the existence of coverage under the Zurich policy, and the alleged existence of coverage is dependent on the trigger theory employed. At the fairness hearing, Judge Zaney directly asked Texas Brine what the court needed to assess to evaluate the merits of the coverage argument. The court asked, do the pre-2012 policies in fact cover sinkhole related damages, that is, damages that occurred on or after August the 3rd, 2012? Counsel for Texas Brine responded affirmatively, that was the issue for the court to determine. So with the benefit of more than six years familiarity with the underlying facts, claims, and defenses of the parties, the district court rejected each of Texas Brine's objections to the settlement and its incorrect trigger of coverage theory. Counsel for Plain Us frankly acknowledged at the fairness hearing the unlikelihood they could recover substantial damages for pre-sinkhole subsidence to Plain Us' undeveloped properties, agreeing that this settlement was, and I quote, the best avenue in connection with the pre-2012 insurers. As Plain Us stated, the Texas Brine can't establish any abuse of discretion in the approval of the pre-sinkhole class settlement, where the district court expressly determined the settlement was fair, reasonable, and adequate to settlement class members, confirmed that all relevant Rule 23 factors were satisfied, found the settlement fully and finally released, all covered and uncovered pre-sinkhole claims against Texas Brine. Texas Brine itself misstates Louisiana law in arguing that the district court misapplied governing law in approving the class-wide settlement of the pre-sinkhole claims. Texas Brine essentially urges this court to ignore its eerie constraints by adopting a coverage trigger theory foreign to Louisiana courts. Federal courts sitting in diversity apply the substantive law of the forum state and must look to decisions of the highest court of the state. When there is no ruling by the state's highest court, it's the duty of the federal court to That's the Flynn and Transcontinental Pipeline Corporation cases we cited in our brief. Texas Brine's substantive coverage arguments are wholly inconsistent with established Louisiana law. In Norfolk Southern, the First Circuit expressly acknowledged that Louisiana courts apply the manifestation theory when addressing issues of coverage for property damage other than long-term environmental damage. What did you say to Texas Brine's argument a few minutes ago about some other circuit court opinion that indicated heavy reliance on the language of policy and not on the manifestation theory? The Orleans Parish versus Shade case, the Fourth Circuit case that language and that case is, it arises out of the agricultural street landfill. That is a long-term, it was, you know, long-term environmental property damage. That is not the same as a sinkhole that appeared on August 3, 2012. And that's exactly why Judge Zaney said that the exposure trigger doesn't apply here. The First Circuit has recognized the clear weight of authority in more recent cases since the 96 Shade case adopts the manifestation theory for property damage cases under Louisiana law. That's the M&R drywall versus map construction case cited in our brief. This case involved a catastrophic discrete occurrence that was the plainest loss of use damages. It's significant that no Louisiana courts have applied the continuous trigger theory in a property damage case under Louisiana law. All the cases Texas Brine cites in its brief are from multiple other jurisdictions, New York, Delaware, Illinois, Hawaii, which apply the continuous trigger theory. But the district court here was not free to do so under Erie and certainly did not commit legal error in failing to apply a trigger theory that has not been adopted or applied by any Louisiana courts. All right, Ms. Davis. Yes. Thank you. Your time is up. Thank you for your assistance. You're up, Mr. Mercer. Thank you, Your Honors. Glenn Mercer on behalf of the Zurich entities. And I think the court's already hit on, you know, what is the issue here is, is the Zurich policy triggered in this case? And I would disagree, Mr. Chalkley. I think this is a very simple case. This is a simple burden of proof case, as recognized by Judge Zaney. As the party seeking coverage, Texas Brine admits it has the burden of proof. If it cannot meet its burden of proof, it loses. And it's quite that simple. And so the starting point for any trigger analysis for any policy is the actual language of the policy. And if you'll notice in some of the cases that are cited by Texas Brine, the policy language is just different from what is in the Zurich policy. So you need to start with the language of the policy that is in front of you. The Zurich policy absolutely requires property damage during the policy. So a lot of the cases involving asbestos and toxic tort long-term lengthy cases, they all find that there was property damage during the policy. What is impossible to prove is the scope and extent of that damage. So for instance, with asbestos, if you have a mesothelioma case, it's scientifically impossible to prove what fiber of asbestos caused the disease 30 years later. That's impossible to prove. It is not impossible to prove when the sinkhole occurred. So Texas Brine argues, well, you're asking us to prove the impossible. That's simply not true. We're asking you to prove that there was property damage during our policy, which you have the burden of proving. All of the cases involving asbestos or environmental damage that occurred over a long time, the courts found there was damage. There was a leak. There was a spill. There was an inhalation of asbestos. Here, we don't have that. What we have is experts, they don't testify as to a deformation process. Look at what they testify to. There are two data points. A satellite passed over the area on June 23, 2011. There was no deformation. The satellite comes back on July 2, 2012. Now there's a deformation. And with respect to prematurity, the experts all admit there's no other evidence. There's nothing we're working on. There's nothing we're cooking up. There's no new technology we're testing. It has been years. And the experts admit they have no property damage prior to July 2, 2012, which is when that second satellite came over. Mr. Chaklis was questioned extensively about that by Judge Zaney. Mr. Chaklis admitted, we have no evidence. So at some point, there's a termination point. When you have a trial, that's a termination point. If you discover evidence later, a new technology comes down the pike, there's a point at which it's over. And at this fairness hearing, Texas Brine and its experts admitted, we have no other evidence. There is no other evidence. So this is no different, your honors, than, you know, say you have a car insurance policy, expires at midnight. You go to bed, your car's there. You wake up the next morning, your car's gone. It is not impossible to prove when the car was stolen. You may not be able to prove it. That's a different story. It's provable. In this case, the only evidence we have, the only evidence there is, is we know there was a sinkhole on August 3rd, 2012. And we have satellite data indicating that there was a surface deformation a few weeks before that on July 2nd. There is no evidence of any property damage that occurred during Zurich's 2011 policy, which expired on March 1st, 2012. So this is- Let me ask you about how your phrase property damage, obviously the policy's phrase, and the manifestation theory, how those two interact. If Texas Brine had evidence, which it doesn't, and that's not the case, but help me understand your argument. If it had evidence, scientific evidence, that in light of the satellite imagery in July of 2012, that much of a depression or whatever it was, must have started six months earlier. And here's the science. Is that evidence relevant? Or does your understanding of manifestation theory mean that it's not relevant? It very well could be relevant, your honor. If they had satellite data of a deformation during our 2011 policy period, let's say that June 23rd, 2012- No, no. That's not my hypothetical. My hypothetical is there's no evidence, physical evidence, satellite imagery or somebody falling into a hole before July 2012 after your policy expired. But there was scientific evidence from experts saying if it was that much of a depression on that date, in light of what it looked like a year earlier, whatever goes into the science, that must have started subterranean. The damage was starting to occur at some day within the policy period. Is that relevant evidence in your understanding what manifestation means? Not in this case, your honor, because I think you haven't put it in the context of what the plaintiffs are claiming. So here you have the ABER plaintiffs are claiming that part of their property fell into the sinkhole. So what's happening underground is completely irrelevant. They're not seeking damage for anything happening underground. They're seeking damage or part of their property falling into a sinkhole. So I think the only thing relevant in that context is the context of the plaintiff's claim. In the context of this claim, what is relevant is when there is evidence that their property began to fall into a sinkhole. So here, the earliest potential evidence we have of that is the July 2nd, 2012 satellite photo. And so this case, in my mind, your honors, is very similar to three cases that have already been addressed by the First Circuit. The Crosstex case, the Pontchartrain case, and the Florida gas case. In each of those cases, the pipeline plaintiffs had pipelines that were underground. They went underground through what became the sinkhole. On August 3rd, 2012, those pipelines fell into the hole, just like the ABER plaintiffs are claiming their property fell into the hole. And just as in this case, in that case, Texas Brine had these experts speculate, well, you know, these pipelines could have been damaged before August 3rd, 2012. Well, you know, those pipelines could have started to deform before July 4th, August 3rd, 2012. And the First Circuit, in each of those cases, found that there was simply no evidence of any property damage prior to August 3rd, 2012. Texas Brine is trying the same trick here in their having their experts, in this case, they admit they don't have any evidence. Mr. Chalkley is asserting that there's evidence of a process. Read the evidence. There is no evidence of a process. What these experts have said, what Mr. Chalkley has admitted, is we have two data points for the satellite data. One date during our policy period, there's no evidence of any deformation. Almost a year later, a little over a year later, we have a deformation, and there's no evidence of when and if that deformation existed prior to July 2nd, 2012. So we're not even really talking about, strictly speaking, your honors, a manifestation theory. We're not arguing really that Texas Brine didn't discover it until July 2nd, 2012. There's no evidence that it existed. So this is not a situation where Texas Brine, oh, we weren't aware of it. But look, here's some evidence that it existed. There is not a shred of evidence that any surface deformation existed prior to July 2nd, 2012. So the district court based its decision on what evidence is available. The only evidence available to any party to this case is July 2nd, 2012 as the earliest possible date. So it is, again, I believe a simple burden of proof. There is no evidence that would trigger this 2011 policy. Given that lack of evidence, Texas Brine admits it has a burden of proof. It's not an impossible burden of proof. It's a burden of proof. So with that, I think, you know, I agree with Judge Zaney. He found Texas Brine had a burden of proof that the evidence, all the evidence that is available dictates that there was no surface deformation. You cannot prove there was a surface deformation during the Zurich policy. Therefore, Texas Brine is not prejudiced and the settlement should be approved. And I would note, Your Honor, that, you know, Texas Brine does have other claims pending against Zurich in this matter, including bad faith claims. The issue before this court is whether Texas Brine is prejudiced by this settlement. And as Judge Zaney found, they're not because they cannot bear the burden of proof. All right, Mr. Mercers, thank you. Thank you. Five minutes for rebuttal. You may have a lot to cover, but I have. Okay, I'll be brief, Your Honor. Thank you. Just real quick. It's just not true. This case is not like the other pipeline cases that Mr. Mercer cited. The evidence is that this damage occurred before July 2nd, 2012. And the proof of that in our brief record site 37272 is the deposition testimony of Glenn Hickerson, AIG expert, that this damage occurred before July 2nd, 2012. They can't say that, well, the only thing we know is that it happened as of July 2nd, 2012. That's not the evidence. The expert testimony is that it happened before July 2nd, 2012. Now, and I want to come back to the asbestos thing, because I think it is important where they talk about the trigger is the alleged inhalation of exposure, but that in that asbestos case and in the Norfolk Southern case, they didn't prove that the operations caused contamination, property damage. They just used the years of operations as an approximation to determine what the trigger is. And that's all we're saying here is that we're using the time period when this deformation occurred as an approximation of when this damage occurred. You know, Mr. Mercer made the point about if the car, if your car is stolen at some point when you go to bed and the policy started, you know, changed at midnight, you went to bed at eight, you woke up at eight, who knows when the car was stolen? Their position is basically tough. You didn't have a camera. You couldn't figure it out when the car was stolen. You're out of luck. Our position is if you look at the cases where it's similarly and we didn't have a camera a thousand feet under the ground to determine exactly what was happening, just like you didn't have a camera where the car was that in these situations where it's impossible to prove it, courts have triggered coverage during the specific period of time when it could have happened. And that's our argument is that there is, there should be coverage under those theories of law and that we are prejudiced in not being able to access the Zurich policy to use to settle the remaining claims. All right, counsel, thank you for all this. You have lived with the case a whole lot longer than we have, but we will get you an answer as soon as we can so you can move on. Thank you. Thank you, your honors. We appreciate the opportunity. Thank you. That is all on this.